**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| The **UNITED STATES OF AMERICA**, the States of **INDIANA** and **TENNESSEE**, and the Commonwealth of **VIRGINIA** *ex rel.* **RALLIE McALLISTER, M.D., M.P.H.**, <br><br> Plaintiffs, <br><br> v. <br><br> **SPERO HEALTH, INC.**; **SPERO HEALTH HOLDINGS, LLC**; and **STEVE PRIEST**, <br><br> Defendants. | DOCKET NO. _____ <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

## *QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff and *qui tam* Relator Rallie McAllister, M.D., M.P.H., by and through her undersigned counsel Brown, LLC and Weatherly, McNally & Dixon, PLC, alleges of personal knowledge as to her own observations and actions, and on information and belief as to all else, as follows:

**I.**
**PRELIMINARY STATEMENT**

1.      Defendants Spero Health, Inc., and Spero Health Holdings, LLC, (collectively, "Spero" or the "Company"), together own, operate and/or manage outpatient clinics for the treatment of those with substance abuse disorder ("SUD") generally and opioid use disorder ("OUD") in particular, in each of the Plaintiff States, as well as in Kentucky and Ohio.[1]

---

[1] Kentucky and Ohio are not named as Plaintiff States herein because their laws proscribing Medicaid fraud do not include *qui tam* provisions.

2.    Under the direction of, or at least with the full knowledge and acquiescence of, Defendant Steve Priest, the President and CEO of Spero Health, Inc., the Company's staff:

    a.  prescribe the medication Suboxone when not medically indicated;

    b.  improperly submit prescriptions to pharmacies using the credentials of physicians *other than* the treating physicians, in order to circumvent regulatory limits[2] on the number of patients for whom any one physician may prescribe Suboxone;

    c.  order unnecessary urine drug testing ("UDT");

    d.  fail to order adequate *random* UDT for existing patients; and

    e.  bill for higher levels of care than they can possibly provide, given the number of patients each provider is expected to see each day.

3.    Defendants' fraud is not only draining the public fisc; it is also contributing to, rather than helping to curb, the epidemic of opioid addiction currently plaguing our nation. Principles of patient care are being abandoned in Defendant Priest's relentless quest to expand the Company and to generate profit from human misery.

4.    Relator brings this *qui tam* action on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), to recover treble the damages actually sustained by, and civil penalties and restitution owed to, the United States as a result of Defendants' fraud.[3]

---

[2] *See* 42 C.F.R. §§ 8.610 – 8.655 (implementing the Drug Addiction and Treatment Act ("DATA") and permitting qualified providers to carry no more than 275 patients receiving medication-assisted treatment for OUD).

[3] Because Medicaid is partially funded by the federal government, the United States has a cause of action under the federal False Claims Act for false claims made to state Medicaid programs. *See, e.g., Hays v. Hoffman*, 325 F.3d 982, 988 (8th Cir. 2003) ("When Congress amended the FCA in 1986, it defined 'claim' to include requests for money made to grantees of the federal government. The legislative history explained this was done to clarify that false claims for FCA purposes include claims submitted to state agencies under the Medicaid program and other State, local, or private programs funded in part by the United States where there is significant Federal regulation and involvement.") (internal citation and quotation marks omitted; citing S. Rep. No. 99-345 at 22, 1986 U.S.C.C.A.N. at 5287); *Kane ex rel. United States v. Healthfirst, Inc*., 120 F. Supp. 3d 370, 396 (S.D.N.Y. 2015) ("Congress has repeatedly and specifically provided that claims submitted to Medicaid constitute false claims for the purposes of the FCA.") (citing, *inter alia*, S. Rep. No. 111-10, at 11, 2009 U.S.C.C.A.N. at 438, explaining that the 2009 Fraud Enforcement and Recovery Act clarified that "the FCA reaches all false claims submitted to State administered Medicaid programs."). In particular here, the United States has a cause of action under the federal FCA for fraud against the Medicaid

5.      Relator also brings this *qui tam* action on behalf of the State of Indiana, under the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7-1 *et seq.* (the "Indiana Act"), to recover treble the damages sustained by, and civil penalties and restitution owed to, Indiana as a result of Defendants' fraud.

6.      Relator also brings this *qui tam* action on behalf of the State of Tennessee, under the Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.* (the "Tennessee Act"), to recover treble the damages sustained by, and civil penalties and restitution owed to, Tennessee as a result of Defendants' fraud.

7.      Relator also brings this *qui tam* action on behalf of the Commonwealth of Virginia, under the Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.* (the "Virginia Act"), to recover treble the damages sustained by, and civil penalties and restitution owed to, Virginia as a result of Defendants' fraud.

8.      This Complaint has been filed in camera and under seal pursuant to 31 U.S.C. § 3730(b)(2) and the analogous laws of the Plaintiff States. Copies of the Complaint, along with written disclosure of substantially all material evidence and information that Relator possesses, have been served on the Attorney General of the United States and the United States Attorney for this District, pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d); and on the Attorneys General of the Plaintiff States, pursuant to the laws of those states. The Complaint will not be served on Defendants unless and until this Court so orders.

---

programs of Kentucky and Ohio, and that cause of action may be advanced by Relator, even though the laws of those states do not include *qui tam* provisions.

## II.
## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, a federal statute.

10.     This Court has subject matter jurisdiction over the related state-law claims pursuant to 31 U.S.C. § 3732(b).

11.     The Court has personal jurisdiction over Defendants because at least one Defendant (a) is a resident of, and/or is licensed to transact and does transact business in, this District; and (b) has carried out the fraudulent scheme in this District.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 (b)(2), because at least one Defendant can be found in, is licensed to do business in, and transacts or has transacted business in this District, and the events and omissions that give rise to these claims have occurred in this District.

13.     The Complaint has been filed within the period prescribed by 31 U.S.C. §§ 3731(b) and 3730(h)(3), Ind. Code Ann. § 5-11-5.7-9(b), Tenn. Code Ann. § 71-5-184(b), and Va. Code Ann. § 8.01-216.9.

## III.
## NO PUBLIC DISCLOSURE;
## ORIGINAL SOURCE

14.     Relator makes the allegations in this Complaint based on her own knowledge, experience and observations.

15.     Relator is the original source of the information on which the allegations herein are based, and has voluntarily disclosed such information to the United States and the Plaintiff States before filing this action.

16.     There has been no public disclosure, relevant under 31 U.S.C. § 3730(e), Ind. Code Ann. § 5-11-5.7-7(d)-(e), Tenn. Code Ann. § 71-5-183(e), or Va. Code Ann. § 8.01-216.8, of the "allegations or transactions" in this Complaint. Alternatively, to the extent that any such public disclosure has been made, Relator has knowledge that is independent of and materially adds to that public disclosure.

## IV.
## THE PARTIES

### A.     Government Plaintiffs

17.     Relator brings this action on behalf of Plaintiff the United States of America. At all times relevant to this Complaint, the United States, acting through the Centers for Medicare & Medicaid Services ("CMS") provided monies that were used to reimburse Defendants.

18.     Relator also brings this action on behalf of Plaintiff the State of Indiana. At all times relevant to this Complaint, Indiana, acting through its Medicaid program, provided monies that were used to reimburse Defendants.

19.     Relator also brings this action on behalf of Plaintiff the State of Tennessee. At all times relevant to this Complaint, Tennessee, acting through TennCare, the state's Medicaid program, provided monies that were used to reimburse Defendants.

20.     Relator also brings this action on behalf of Plaintiff the Commonwealth of Virginia. At all times relevant to this Complaint, Virginia, acting through its Medicaid program, provided monies that were used to reimburse Defendants.

### B.     Relator

21.     Relator Rallie McAllister, M.D., M.P.H., is a specialist in family medicine and a nationally recognized health expert. She has written a syndicated newspaper column and has been featured as a medical expert on more than 100 radio and television shows.

22. Dr. McAllister has also been featured in dozens of popular publications, including USA Today, Women's Day, Better Homes and Gardens, Redbook, Family Circle, Parenting, Prevention, Men's Health, Women's World, Cosmo, Glamour, Health Magazine, Energy Times, Arthritis Today, and dozens of newspapers. She has authored hundreds of articles on dozens of popular health-related websites, including WebMD.com, lifetimetv.com, ivillage.com, parentsmagazine.com, msn.com, parentingbookmark.com, womenof.com, familyresources.com, Christianmommies.com, and babycenter.com.

23. At all times relevant to this Complaint, Dr. McAllister has been a resident of Fayette County, Kentucky.

24. Dr. McAllister is employed by Spero, and practices mainly at the Company's locations in Danville and Moorehead, Kentucky.

C. **Defendants**

25. Defendant Spero Health, Inc., is a corporation formed and existing under the laws of the State of Delaware, with a principal place of business at 5141 Virginia Way, Suite 390, Brentwood, Tennessee 37027-9505, which is within this judicial District.

26. According to its website, "Spero Health, Inc., is an integrated healthcare services organization specializing in local and affordable outpatient care for individuals suffering from substance use disorder … [whose] integrated care model combines physician services (including medication assisted treatment), behavioral health counseling, recovery support services, medication management and patient and family education."[4]

27. "Based in Nashville, TN and privately held by Heritage Group, Health Velocity Capital, South Central, Inc. and Frist Cressey Ventures, Spero Health operates more than 30

---

[4] https://sperohealth.com/our-story/ (last accessed Feb. 17, 2020).

6

freestanding outpatient clinics located throughout Kentucky, Ohio, Indiana and Tennessee. Providing care for more than 6,000 patients each month, Spero is one of the largest office-based opioid treatment providers in the country and is in network with Medicaid and most commercial insurance plans."[5]

28.     Spero Health, Inc. was formed in early 2018, chiefly for the purpose of acquiring clinics that were owned and/or operated by SelfRefind, a Kentucky-based addiction services provider. Defendant Steve Priest became CEO of SelfRefind in approximately 2016 or 2017, and then SelfRefind was acquired by Spero in mid-to-late 2018, after which Priest became President and CEO of that company.[6]

29.     Defendant Spero Health Holdings, LLC, is a limited-liability corporation formed and existing under the laws of the State of Delaware. On information and belief, Spero Health Holdings, LLC, is the holding company for and owner of Spero Health, Inc.

30.     Except where necessary to refer specifically to either of the corporate Defendants, both are collectively referred to herein as "Spero" or the "Company."

31.     Spero owns and/or operates a toxicology laboratory at 1017 Dupont Road, Louisville, Kentucky, to which all urine samples collected at all of the Company's clinic locations are sent for processing.

---

[5] *Id.*

[6] *See, e.g.*, https://www.williamsonhomepage.com/spring_hill/business/new-healthcare-company-in-brentwood-wants-to-help-tackle-opioid/article_846416ee-9e87-534b-8a9a-b883e9c6a55e.html (last accessed March 11, 2020). In 2014 SelfRefind and its owners Bryan Wood and Robin Peavler (who was married to Relator at the time), along with a toxicology lab of which they were part-owners, paid the government a total of $15.75 million "to resolve allegations that they violated the False Claims Act by submitting claims to Medicare and Kentucky's Medicaid program for tests that were medically unnecessary, more expensive than those performed, or billed in violation of the Stark Law." *See* DOJ press release, *available at* https://www.justice.gov/opa/pr/government-settles-false-claims-act-allegations-against-kentucky-addiction-clinic-clinical (last accessed March 11, 2020). Wood and Peavler were convicted of criminal fraud and sent to prison. *Id.*

## V.
## THE STATUTORY FRAMEWORK

**A.      The Federal False Claims Act**

32.      The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), establishes treble

damages liability for any individual or entity that:

>    (A) knowingly presents, or causes to be presented, a false or fraudulent claim for
>         payment or approval; [or]
>
>    (B) knowingly makes, uses, or causes to be made or used, a false record or
>         statement material to a false or fraudulent claim[.]

31 U.S.C. § 3729(a)(1).

33.      "Knowing" is defined in the FCA to include "deliberate ignorance of the truth" or

"reckless disregard of the truth." *Id.* § 3729(b)(1)*.*

34.      The FCA defines "claim" to include any request for money that:

>    (i)  is presented to an officer, employee, or agent of the United States; or
>
>    (ii) is made to a contractor, grantee, or other recipient, if the money … is to be spent
>         or used on the Government's behalf or to advance a Government program or
>         interest, and if the United States Government—
>
>    >    (I)      provides or has provided any portion of the money or property
>    >             requested or demanded; or
>    >
>    >    (II)     will reimburse such contractor, grantee, or other recipient for any
>    >             portion of the money or property which is requested or demanded….

*Id.* § 3729(b)(2)(A).

35.      The FCA provides for the assessment of treble damages for each false claim, plus

a civil penalty.[7]

---

[7] 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted
by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410). The
Federal Civil Penalties Inflation Adjustment Act of 2015, 28 U.S.C. 2461 note, substituted a
different statutory formula for calculating inflation adjustments on an annual basis. Following that formula, on January
29, 2018, the Department of Justice promulgated a Final Rule increasing the penalty for FCA violations occurring

36. The FCA also provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States (the "Relator") under the FCA. *See* 31 U.S.C. § 3730(d).

**B. The Medicaid Program**

37. Medicaid is a joint federal-state health care program, enacted by Congress under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq*.

38. If a state elects to participate in the program, the costs of Medicaid are shared between the state and the federal government. 42 U.S.C. § 1396a(a)(2). In order to receive federal funding, a participating state must enact an administrative plan that satisfies the requirements of the Social Security Act and accompanying regulations. 42 U.S.C. §§ 1396–1396w.

39. At all times relevant to this Complaint, the Plaintiff States have participated in the Medicaid program. The United States has paid a percentage of program costs for each of the Plaintiff States, and the states themselves have funded the remainder of their Medicaid expenditures.

40. The Medicaid programs of Kentucky (where Relator practices), Ohio, and each of the Plaintiff States reimburse providers for medical services, including laboratory testing.

41. As particularly pertinent here, it is generally appropriate for a provider of medication-assisted treatment for SUD or OUD to test patients to ensure that they (a) actually *are* taking (rather than selling) their prescribed medications and (b) are *not* taking other drugs. Urine is the most common medium used for this drug testing, and is the medium commonly used by Spero.

---

after November 2, 2015. For such penalties assessed after January 29, 2018, the minimum penalty is $11,181 and the maximum is $22,363. *See* 28 C.F.R. § 85.5; 83 Fed. Reg. 3945 (January 29, 2018).

42.     Broadly speaking, providers such as Spero use two types of urine drug testing ("UDT") – qualitative (or "presumptive") testing, and quantitative ("confirmatory" or "definitive") testing. These two types of tests are further explained *infra*.

43.     The Medicaid programs of Kentucky, Ohio, and the Plaintiff States will reimburse for both qualitative and quantitative UDT, but only when medically necessary. *See*, *e.g.*:

a.  Indiana Health Coverage Program ("IHCP"): Provider Reference Module: Laboratory Services (2019),[8] at 6 ("The IHCP covers presumptive urine drug testing (UDT) and definitive UDT when medically necessary. … Unnecessarily frequent drug testing without consideration for a specific drug's window of detection" is not covered.).

b.  Kentucky Medicaid Member Handbook,[9] at 18 ("Kentucky Medicaid only pays for services that are medically necessary"); *see also* 907 Kentucky Admin. Reg. 3:130(2)(b) (defining medically necessary as, *inter alia*, "Reasonable and required to identify, diagnose, treat, correct, cure, palliate, or prevent a disease, illness, injury, disability, or other medical condition, … [a]ppropriate in terms of the service, amount, scope, and duration based on generally-accepted standards of good medical practice … [and p]rovided in the most appropriate location, with regard to generally-accepted standards of good medical practice, where the service may, for practical purposes, be safely and effectively provided ….").

c.  Ohio Admin. Code 5160-1-02 ("A medical service is reimbursable if … medically necessary as defined in rule 5160-1-01 of the Administrative Code"); *id.* at 5160-1-01 (defining as medically necessary only those "procedures, items, or services that prevent, diagnose, evaluate, or treat an adverse health condition," and specifying that a procedure will be covered only when, *inter alia*, it "[m]eets generally accepted standards of medical practice," is "[c]linically appropriate in its type, frequency, extent, duration, and delivery setting," and "[i]s the lowest cost alternative that effectively addresses and treats the medical problem").

d.  Tenn. Code Ann. § 71-5-144 (TennCare will reimburse "only those medical items and services that are: (1) Within the scope of defined benefits for which the enrollee is eligible under the TennCare program; and (2) Determined by the TennCare program to be medically necessary"); *see also id.* ("To be determined to be medically necessary, a medical item or service must be recommended by a physician who is treating the enrollee or other licensed healthcare provider practicing within the scope of the physician's license who is treating the enrollee and must [*inter alia*] be required in order to diagnose or treat an enrollee's medical

---

[8] *Available at* https://www.in.gov/medicaid/files/laboratory%20services.pdf (last accessed Feb. 20, 2020).

[9] *Available at* https://chfs.ky.gov/agencies/dms/dpo/epb/Documents/MedicaidMemberHandbook.pdf (last accessed Feb. 20, 2020).

condition …. be safe and effective … [and] be the least costly alternative course of diagnosis or treatment that is adequate for the medical condition of the enrollee").

e. Virginia Medicaid Physician/Practitioner Manual, Ch. IV: Covered Services and Limitations,[10] at "Program Coverage." ("Medicaid defines 'medically necessary services' as those services that are covered under the State Plan and are reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body member. Coverage may be denied if the requested service is not medically necessary according to the preceding criteria or is generally regarded by the medical profession as experimental or unacceptable."); *see also id.*, at "Non-Covered Services" ("The following laboratory and radiology services are specifically EXCLUDED from coverage and payment: Tests performed on a routine basis but not medically indicated by the patient's symptoms. …") (emphasis in original).

44. Physicians and laboratories receiving reimbursement from Medicaid must make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.

45. At all times relevant herein, Defendant Spero has been an enrolled Medicaid provider in each of the Plaintiff States. Defendant is eligible to receive reimbursement for outpatient care it provides to individuals insured through these state Medicaid programs.

46. In order to be reimbursed for services provided to Medicaid beneficiaries, a participating provider such as Spero must submit claims to the appropriate state agency, using either paper or electronic forms. On these forms, the provider identifies the services and procedures for which reimbursement is sought using Current Procedural Terminology ("CPT") and Healthcare Common Procedure Coding System ("HCPCS") codes. 45 C.F.R. § 162.1002(a)-(b); Medicare Claims Processing Manual, Chapter 23, §§ 20.7 *et seq*.

---

[10] *Available at* https://www.ecm.virginiamedicaid.dmas.virginia.gov/WorkplaceXT/getContent?impersonate =true&id={C07E2669-0000-C831-8DF3-8EC0FF3CEDE1}&vsId={EA84D31F-39A3-459B-9F0B-F925CA3B040F}&objectType=document&objectStoreName=VAPRODOS1 (last accessed Feb. 20, 2020).

47.    CMS assigns reimbursement amounts to CPT and HCPCS codes. Accordingly, providing accurate CPT and HCPCS codes on claims submission forms is material to the payment decision for Medicaid and for the Medicaid programs of the Plaintiff States.

48.    Medicaid programs routinely deny payment to providers who bill for codes when the criteria for those codes are not actually met, including (a) when the services are not medically necessary, and/or (b) when services are billed at a higher level than was actually provided.

49.    The paper forms that providers use to submit claims, and their electronic equivalents, require the providers to make the following or similar certification:

> I certify that the services [for which reimbursement is claimed] were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction. … This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

CMS Form 1500, at 2.[11]

## C.    Relevant State Laws

50.    The relevant laws of Kentucky, Ohio, and the Plaintiff States generally track the federal FCA, except that they proscribe the submission of fraudulent claims to state (as opposed to federal) agencies and, as noted *supra*, the laws of Kentucky and Ohio lack provisions that would allow a private individual such as Relator to bring claims on behalf of those states. *See*:

   a.  Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code Ann. §§ 5-11-5.7 *et seq*.;

   b.  Kentucky Control of Fraud and Abuse Laws, Ky. Rev. Stat. Ann. §§ 205.8451-205.855;

---

[11]  *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-Items/CMS1188854  (last accessed Mar. 1, 2020). Many state Medicaid programs, including at least TennCare, and many Medicaid MCOs, require or allow providers to submit claims using CMS Form 1500 or its electronic equivalent.

    c.   Ohio Medicaid Fraud, Waste and Abuse Law, Ohio Admin. Code Ann. §§ 5160-1-29 *et seq.*;

    d.   Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*; and

    e.   Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*

**D.    Urine Drug Testing and Medicaid Reimbursement**

**1.    Types of Urine Drug Tests**

51.    Typically, SUD and OUD patients who are receiving Medication-Assisted Treatment ("MAT") are subjected to periodic urine drug testing (a) to verify whether they are actually taking their prescribed medications (as opposed to selling them on the street), and (b) to verify that they are not taking other drugs, including illicit drugs, that could interfere with their treatment or pose risk of overdose. As noted *supra*, Medicaid programs will pay for such testing when medically necessary.

52.    In most circumstances, a "qualitative" (or "presumptive") test is performed first. A qualitative test can detect the presence of a particular drug or metabolite (or "analyte"), but not its concentration.

53.    If the qualitative test yields an unexpected result, a "quantitative" (or "definitive" or "confirmatory") test is sometimes called for. A quantitative test measures the concentration of a drug in the urine. The medical necessity of quantitative UDT depends on a number of factors, including the patient's history of drug abuse, history of medication adherence and compliance, and clinical presentation.

54.    For example, if a patient is prescribed a certain drug, its presence in the urine (*i.e.*, a positive qualitative test result) would be expected. If the test shows the absence of the drug, however, and the patient insists that she is taking her medication as prescribed, a quantitative test to "confirm" this unexpected negative result may be reasonable and necessary. Similarly, if a

qualitative test yields a positive result for an illicit drug, then quantitative UDT may be reasonable and necessary.

55.     Conversely, if a qualitative test is negative for an illicit drug or positive for a prescribed drug, and there is nothing of concern in the patient's presentation or history, then quantitative UDT for that drug would rarely be reasonable and necessary.

56.     In all situations, quantitative UDT should be utilized only to the limited extent it is necessary for an individual patient, based on qualitative test results and other individualized factors. Quantitative testing should never be ordered reflexively, and a quantitative test will virtually *never* be medically necessary when the result of a previous qualitative test is not yet even known.

57.     Medically unnecessary services are not reimbursable by the Medicaid programs of Kentucky, Ohio, or the Plaintiff States.

**2.  UDT must be ordered by the treating physician**

58.     The Medicaid programs of Kentucky, Ohio, and the Plaintiff States all require that medical services be individualized to the needs of each patient.

59.     In addition, for laboratory services or tests to be covered by Medicaid, those services must be ordered by a professional practitioner within the scope of his or her practice with the expectation of making a reasonable medical determination. *See* ¶¶ 43, 49, *supra*.

[this space intentionally left blank]

14

## VI.
## DEFENDANTS' FRAUD

**A.  Defendants prescribe Suboxone when not medically indicated**

60.  Suboxone is a brand-name combination of buprenorphine and naloxone, and is used in Medication-Assisted Treatment of Opioid Use Disorder. Suboxone is a partial opioid agonist,[12] and has the potential to create dependency and addiction.

61.  As Oxycontin and other opiates become less available on the street due to crackdowns and lawsuits, Suboxone is increasingly being diverted to the illicit market.

62.  Suboxone is specifically indicated only for patients addicted to opioids. It is not indicated for those addicted to benzodiazepine or methamphetamine, for instance. However, on information and belief, almost every patient who comes to any Spero clinic is prescribed Suboxone, whether they present with OUD or not.

63.  Relator has heard that more than two thirds of the patients (both new and established) at Spero's Barbourville clinic are addicted to substances other than opiates, and she has seen firsthand a similarly high proportion at the Morehead clinic; nevertheless, they are prescribed Suboxone.

64.  Relator was told that the "word on the street" is that patients who come to Spero will be prescribed Suboxone "no questions asked," which they can then sell or trade for benzodiazepine, methamphetamine, or other drugs. As it was put it to Relator, "It's like Spero is recruiting patients with free Suboxone."

---

[12] "An opioid agonist binds to the same receptors in the brain that were activated by the drug of abuse, but in a safer and more controlled manner. These medications can reduce the symptoms of withdrawal and reduce cravings, allowing for a more gradual, controlled recovery process and reducing the risk of relapse." https://pcssnow.org/resource/methadone-buprenorphine-opioid-agonist-substitution-tapers/ (last accessed Feb. 29, 2020).

65.     On information and belief, Suboxone is prescribed at similar levels across all Spero clinic locations.

66.     Suboxone is *not* medically necessary when prescribed for a non-opioid addicted patient. The Medicaid programs of Kentucky, Ohio, and the Plaintiff States will not reimburse for items and services that are not medically necessary. *See* ¶ 43, *supra*. In other words, medical necessity is material to the payment decision of the Medicaid programs of Kentucky, Ohio, and the Plaintiff States.

**B.      Defendants improperly submit prescriptions to pharmacies
using the credentials of physicians *other than* the treating physicians**

67.     Congress passed the Drug Addiction and Treatment Act ("DATA") in 2000, as part of an effort to combat the growing opioid crisis by making OUD treatment more widely available. Prior to DATA, OUD treatment was available only in specially licensed narcotics treatment facilities. DATA allows physicians who receive appropriate training to obtain a waiver from the Drug Enforcement Administration, enabling them to provide Medication-Assisted Treatment in other settings, such as a doctor's office or a clinic such as those operated by Spero. DATA thus greatly expanded the availability of MAT for those suffering from OUD, while creating a lucrative business opportunity for providers.

68.     In recognition of both the special demands of treating MAT patients and the potential of MAT drugs for diversion and abuse, DATA sets limits on the number of MAT patients that can be carried by any one provider. Currently, qualified physicians who meet certain criteria can treat up to 100 patients, and after one year of prescribing at the 100-patient limit they may treat up to 275 patients. *See* 42 C.F.R. §§ 8.610 – 8.655.

69.     In multi-provider clinics like Spero's, a patient who would cause one provider to exceed his prescribing limit can be transferred to another provider who has capacity, thereby

keeping that patient in the clinic *and* keeping the overall patient census as high as possible. However, in order to validly prescribe for that patient, the second provider would have to actually *see* that patient; it is not permissible to use the second provider's credentials to prescribe when the patient is actually being treated by the first provider.

70.      On at least one occasion of which Relator is aware, Spero called prescriptions for Relator's patients in to a pharmacy using the credentials of different providers. Relator believes this was done because she was at her prescribing limit[13] and Spero did not want to lose those patients (or the revenue associated with them). This was on December 26, 2019, when Realtor was at the Barbourville clinic and overheard the medications manager Katie Jones on the telephone.

71.      Relator emailed Josh Collett, Barbourville Facilities Administrator, the next day:

---

**From:** Rallie McAllister
**Sent:** Friday, December 27, 2019 9:09 AM
**To:** Josh Collett ████████████████
**Subject:** Barbourville

Hi Josh,

I hope you had a great Christmas with your beautiful girls. I just wanted to touch base with you about my Barbourville day. When I started my computer at the office yesterday, I couldn't get a connection to CareLogic, and two other computers had the same issue. Samantha called IT and while they were working on the connection I started seeing patients. In the meantime, the med manager began calling in prescriptions, which I thought was because my computer was down so I didn't think much about it. I had quite a few patients scheduled so I spent most of the day in exam rooms. When I was finishing up at the end of the day I was back in the nurses' station and I heard the med manager calling in prescriptions to a pharmacy, and although I had seen the patients, the prescriptions were being called in for other physicians. I don't think I've ever encountered this before, so I wanted to check with you and get a little more information. I'm don't know if the other physicians gave authorization for the prescriptions to be called in under their names while I was the doctor evaluating and treating the patients. I know that when a prescription is called into a pharmacy using my DEA number, the staff either has my orders ahead of time or they know to call me and ask me if it's okay. I know you've reassured me repeatedly that I am well within my 275 patient limit, and I want to make sure that I'm in full compliance with that requirement at all times, so can you check my numbers and reassure me again so I won't worry? Thanks so much Josh. I hope you have a great day.

Rallie

---

[13] Relator did not know her patient count at the time. Spero maintains that information for its providers, and Relator has frequently had difficulty obtaining her count.

17

72.     Relator received the following text in response:



73.     Relator, as the treating physician for these patients, did *not* see them on December 26 for "documented medcheks." Instead, she saw them for evaluation and management ("E&M") and, on information and belief, Spero billed for the visits accordingly. *See* ¶¶ 93-102, *infra*.

74.     After receiving the text from Collett, Relator called Spero's Medical Director, Dr. Darrin Mangiacarne. He told her that he would try to address the situation, but that he really had no authority at Spero and was "medical director in name only."

75.     The patients unwittingly involved in this incident are Kentucky Medicaid beneficiaries, and Kentucky Medicaid paid to fill the prescriptions that were called in for them. Because the claims for those prescriptions were knowingly and materially inaccurate, the claims were false and fraudulent under the FCA.

76.     Relator understands that this is standard practice at Spero, not only in Kentucky but across all Spero locations.

18

77.     A claim for a prescription issued by a provider other than that patient's treating provider is materially false, both factually and legally. The Medicaid programs of Kentucky, Ohio, and the Plaintiff States will not reimburse claims that contain material falsehoods. In other words, the accuracy and truthfulness of claims forms is material to the payment decision of the Medicaid programs of Kentucky, Ohio, and the Plaintiff States.

## C.     Defendants order unnecessary urine drug testing ("UDT")

78.     Medicaid agencies and managed-care organizations ("MCOs") set their own policies for UDT reimbursement for patients in Medication-Assisted Treatment for OUD. *See*, *e.g.*, CareSource Policy PY 0155[14] (reimbursing "up to 6 qualitative/presumptive tests in any rolling 90 day period for each member" in Indiana); Humana CareSource Policy PY-0087[15] (reimbursing "up to 25 UDT in a calendar year for each member" in Kentucky); WellCare Policy CPP-116[16] (reimbursing up to "35 presumptive and 16 definitive UDTs per calendar year per individual beneficiary" in Kentucky); CareSource Policy PY-0020[17] (reimbursing "up to 30 presumptive and 12 definitive UDT per member per calendar year" in Ohio); "TennCare Medication Assisted Treatment (MAT) Network: Program Updates,"[18] at 49 (increasing annual UDT reimbursement limits from 12 to 24 per member per calendar year as of Jan. 1, 2019); UnitedHealthCare

---

[14]  *Available at* https://www.caresource.com/documents/medicaid-in-policy-reimburse-py-0155-20180317/ (last accessed Feb. 26, 2020).

[15]  *Available at* https://www.caresource.com/documents/medicaid-ky-policy-reimburse-py-0087-20190329/ (last accessed Feb. 26, 2020).

[16]  *Available at* https://www.wellcare.com/Kentucky/Providers/Medicaid/Claims/Payment-Policy (follow "Drug Testing" link) (last accessed Feb. 26, 2020).

[17]  *Available at* https://www.caresource.com/documents/medicaid-oh-policy-reimburse-py-0020-20190617/ (last accessed Feb. 26, 2020).

[18] *Available at* https://www.tn.gov/content/dam/tn/tenncare/documents/2018MATNetwork.pdf (last accessed Feb. 26, 2020).

Community Plan Policy Number 2020R6005A[19] (reimbursement limited to 18 presumptive 18 definitive drug tests per calendar year).

79. No matter how many UDTs a Medicaid agency or MCO may cover, they will actually reimburse only for those that are medically necessary.

80. Relator has knowledge that Spero often performs and bills for many more UDTs than Kentucky Medicaid MCOs allow – sometimes as many as 60 or 70 in a year for one patient.

81. In order to enable this fraud, Spero does not require its treating physicians to personally sign all UDT orders. Instead, Spero staff members are instructed by management to simply "re-use" a UDT order originally issued by a physician. This allows UDT to be "ordered" for patients on days other than when they actually see their treating physician (usually once per month) – for instance, on the days when the patients come to see a counselor or to attend a group session.

82. Relator took the following photographs of an email raising concerns about patterns of unnecessary testing at Spero's location in Madisonville, Kentucky, sent by another Spero provider to David Hayden, Spero's V.P. for Clinical Services, on November 20, 2019:

[this space intentionally left blank]

---

[19] *Available at* https://tinyurl.com/UHC-Policy-2020R6005A (last accessed Feb. 29, 2020).



83.     The provider states that he is "still trying to understand the medical necessity of ordering a quantitative UDS and qualitative UDS on the same day **before the results of the qualitative can be reviewed.**" (Emphasis added). A quantitative UDT ordered before reviewing qualitative results is a paradigm example of a procedure **lacking** in medical necessity. The provider also questions the practice at the Madisonville location of seeing patients weekly and ordering UDT at every visit.

84.     This same provider separately informed Relator that he had counted approximately 76 drug screens ordered for one Spero patient in roughly a year, and nearly 100 for another. Relator herself has seen patient charts showing similarly excessive testing.

85.     In an egregious example of Spero's disregard for the laws and regulations covering the ordering of UDT, Relator was contacted on or about February 10, 2020 by Christi Altobello, a Regional Manager at Spero, telling Relator that her credentials would be used to order testing for several patients whom Relator had never even **met**, much less treated, and that this was necessary because the Nurse Practitioner who had actually been seeing those patients had left the Company. Relator contacted Medical Director Mangiacarne who confirmed that the request was illegal. When Relator conveyed that information to Altobello, she claimed that David Hayden (V.P. for Clinical Services) had told her it would be permissible, but then Altobello told Relator that the Nurse Practitioner's name had been put back in the medical-records system and that Spero "will proceed with her" – even though she was no longer employed by the Company. This too, of course, was a blatantly illegal solution.

86.     On information and belief, excessive UDT is routinely ordered, not only at Spero locations in Kentucky but across all Spero locations.

87.     As recently as August 1, 2019, Regional Manager Christi Altobello emailed Relator about a decline in the number of UDT orders at the Danville clinic. Altobello – who Relator believes has no clinical training – wrote that she "would like to see us order more confirmation [i.e., quantitative] testing …."

88.     On information and belief, it is common practice at Spero to order quantitative UDT "before the results of the qualitative can be reviewed."

89.     On further information and belief, Spero sends all urine samples collected at all of its clinic locations to the toxicology laboratory the Company owns in Louisville. This means that the Company captures reimbursement for both the professional and the technical component of every UDT conducted on its patients.

22

90. The Medicaid programs of Kentucky, Ohio, and the Plaintiff States will not reimburse for items and services that are not medically necessary. *See* ¶ 43, *supra*. In other words, medical necessity is material to the payment decision of the Medicaid programs of Kentucky, Ohio, and the Plaintiff States.

**D. Defendants fail to order required *random* UDT for existing patients**

91. Federal guidelines require monthly random urine drug screens for patients receiving MAT. *See* 42 C.F.R. § 8.12(f)(6) ("For patients receiving long-term detoxification treatment, the program shall perform initial and monthly random tests on each patient.").

92. Relator orders random testing for virtually all of her patients, virtually every month. However, when she recently reviewed the charts of several dozen patients she found that none had *any* documented random tests in either 2019 or 2020. She has met several times about this with the Facilities Administrators at the Barbourville and Danville clinics, as well as with Christi Altobello and David Hayden, and she has spoken on the phone with Medical Director Mangiacarne about this on numerous occasions, to no avail. She has personally asked Spero lab technicians and medication managers to follow her orders many times, with no success.

93. Relator can only conclude that Spero management wants to avoid random testing that could reveal the noncompliance of patients who may be diverting their medication, in order to keep those patients – and their Medicaid dollars – "happy and coming back."

[this space intentionally left blank]

23

**E.      Defendants bill for higher levels of care than provided**

94.      On December 17, 2019, David Hayden, Spero's V.P. for Clinical Services, sent an email to Spero's physicians in Kentucky, Defendant Steve Priest, and others, excerpted below:

**From:** David Hayden ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, December 17, 2019 4:02 PM
**To:** SperoHealth-Physicians and NPs ▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Steve Priest ▮▮▮▮▮▮▮; Clint Cromwell ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮; Ed Littlejohn ▮▮▮▮▮▮▮▮▮▮; Christi
Altobello ▮▮▮▮▮▮; Monnie Murray ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮; Rhonda Roper ▮▮▮▮▮▮▮▮▮▮; Park
Neumann ▮▮▮▮▮
**Subject:** URGENT. PLEASE READ/REVIEW

Dear Physician and Nurse Practitioners,

Recently, we were notified by the Kentucky Medicaid Behavioral Health Policy Team that it is Kentucky Medicaid's expectation that patients diagnosed with Substance Use Disorder including Opioid Use Disorder should receive a level 3 or above E&M level of care visit when seeing a physician or nurse practitioner. It is our understanding that Kentucky Medicaid is expecting this level of care because they have determined that patients with SUD / OUD have <u>complex issues that may require more time and/or a higher level of medical judgment</u>. In order to drive this level of care, Kentucky Medicaid has removed the level 1 and 2 E&M codes from the fee schedule applicable to SUD providers going forward and will NOT reimburse for these levels of service. Therefore, in order for physician and nurse practitioner E&M services treating SUD patients to be reimbursed under Kentucky Medicaid, <u>physicians and nurse practitioners must perform and document the necessary work and level of care required to meet the level 3, 4, or 5 E&M code requirements.</u>

*See also* "Kentucky Medicaid Behavioral Health & Substance Abuse Services Outpatient (Non-Facility) Fee Schedule (Effective 7/22/2019)"[20] (listing 99203-05 (for new patients) and 99213-15 (for established patients) as the only payable codes for E&M visits).

95.      Hayden went on to summarize what he referred to as "the general level of care requirements associated with E&M levels 3-5":

---

[20] *Available at* https://chfs.ky.gov/agencies/dms/DMSFeeRateSchedules/July2019BHInpatientFeeSchedule.pdf (last accessed Feb. 26, 2020).

The level of care and documentation for a level 3 NEW PATIENT requires THREE out of THREE of the following:
1) Detailed History
2) Detailed Exam
3) Low Complexity Medical Decision-Making

The level of care and documentation for a level 3 ESTABLISHED PATIENT requires TWO out of THREE of the following:
1) Expanded Problem Focused History
2) Expanded Problem Focused Exam
3) Low Complexity Medical Decision-Making

**LEVEL 4**
The level of care and documentation for a level 4 NEW PATIENT requires THREE out of THREE of the following:
1) Comprehensive History
2) Comprehensive Exam
3) Moderate Complexity Medical Decision-Making

The level of care and documentation for a level 4 ESTABLISHED PATIENT requires TWO out of THREE of the following:
1) Detailed History
2) Detailed Exam
3) Moderate Complexity Medical Decision-Making

**LEVEL 5**
The level of care and documentation for a level 5 NEW PATIENT visit requires THREE out of THREE of the following:
1) Comprehensive History
2) Comprehensive Exam
3) High Complexity Medical Decision-Making

The level of care and documentation for a level 5 ESTABLISHED PATIENT visit requires TWO out of THREE of the following:
1) Comprehensive History
2) Comprehensive Exam
3) High Complexity Medical Decision-Making

96.     Relator and other Spero providers are often scheduled to see 40 or more patients per day. Such scheduling simply does not leave enough time for a conscientious provider to do all of the things required at each appointment to justify coding at Level 3 or above.

97.     For instance, on July 9, 2019, Relator was actually expected to see 49 patients during her work day of 6¼ hours (8:00 a.m. to 2:15 p.m.). Even if she had been able to move immediately from one patient to the next with no breaks whatsoever, she would have been able to spend only a little more than 7½ minutes with each patient.

98.     Relator actually saw patients for far longer than 6¼ hours that day, but even so she estimates that she was able to spend no more than approximately ten minutes with each patient, and still did not have time to properly complete all of the expected tasks to justify coding even at Level 3, let alone Level 4 or 5. And yet, on information and belief, Spero billed each of these visits at Level 3 or above.[21]

99.     Relator has frequently been admonished by Regional Manager Altobello and V.P. for Clinical Services Hayden to "capture more dollars" by coding at least at Level 3, and to increase her charting speed – because Spero expects to be able to bill a patient's insurance "as they're walking out the door."

100.     Staff at Spero's Barbourville location told Relator that they had been instructed by Facilities Administrator Collett not to take patients' vital signs, presumably because there was not enough time due to overscheduling. Vital signs are required as part of a Level 3-5 visit, whether for a new or an established patient. Relator was told that because of this, staff sometimes "made up" vital signs and entered them in the charts. Relator informed Medical Director Mangiacarne immediately, and thereafter Barbourville staff began collecting vital signs – at least on the days when Relator was onsite.

101.     Another consequence of overscheduling is that providers seldom have time to even look at previous UDT results before seeing a patient. Relator believes that a significant number of

---

[21] Spero's care falls short in other ways. For instance, Relator's orders for lab work are routinely not followed. She typically is unable to get bloodwork for HIV, Hepatitis, and liver function in a timely manner – or at all – even though such testing is required for Suboxone treatment. Relator believes that Spero's lab technicians are following the orders of Altobello and Hayden, and not those of the treating physician. As another example of Spero's disregard for the standard of care, Relator recently learned that a technician at the Morehead whose duties include drawing patients' blood for testing had not been given phlebotomy training by Spero; instead, she had tried to teach herself by watching YouTube videos and practicing on herself at home.

the tests ordered for Spero patients are never reviewed at all, further undercutting any pretense of medical necessity for these excessive tests.

102.    On information and belief, overscheduling is the norm for all Spero locations – as is the practice of coding at Level 3 or above.

103.    Claims that misrepresent the level of care provided are materially false, both factually and legally. The Medicaid programs of Kentucky, Ohio, and the Plaintiff States will not reimburse claims that contain material falsehoods. In other words, the accuracy and truthfulness of claims forms are material to the payment decision of the Medicaid programs of Kentucky, Ohio, and the Plaintiff States.

## VII.
## COUNT ONE
## FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS
## 31 U.S.C. § 3729(a)(l)(A)

104.    Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

105.    As alleged above, Defendants presented or caused to be presented to CMS claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were submitted using the credentials of physicians other than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

106.    These claims were submitted with the full knowledge and acquiescence of Defendant Steve Priest.

107.    These claims were false and fraudulent, in that they were (a) legally false, in that Defendants certified when making the claims that they complied with all relevant laws and regulations, when they did not, and/or (b) factually false, in that they misrepresented material facts about the services for which reimbursements were claimed.

108.     The submission of these false claims by Defendants caused CMS to pay out monies that it would not have paid if it had known of the falsity of the claims.

109.     Accordingly, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(l)(A).

110.     Each false or fraudulent claim submitted is a separate violation of the FCA.

111.     By reason of the false or fraudulent claims that Defendant presented or caused to be presented, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the FCA, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the United States and Relator.

**VIII.**
**COUNT TWO**
**FEDERAL FALSE CLAIMS ACT:**
**MAKING OR USING FALSE RECORD OR STATEMENT**
**31 U.S.C. § 3729(a)(l)(B)**

112.     Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

113.     As alleged above, Defendants made and used false records and statements when they submitted or caused to be submitted to CMS claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were submitted using the credentials of physicians other than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

114.     These false records and statements were made and used with the full knowledge and acquiescence of Defendant Steve Priest.

28

115.     The making and use of these false records or statements caused CMS to pay out monies that it would not have paid if it had known of the falsity of Defendants' records and statements.

116.     Accordingly, Defendants knowingly made and used false records or statements material to false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(l)(B).

117.     Each such making or use of a false record or statement is a separate violation of the FCA.

118.     By reason of the false or fraudulent claims that Defendants made or used, or caused to be made or used, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the FCA, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the United States and Relator.

## IX.
## COUNT THREE
## INDIANA MEDICAID FALSE CLAIMS
## AND WHISTLEBLOWER PROTECTION ACT: PRESENTATION OF FALSE CLAIMS
## Ind. Code Ann. § 5-11-5.7-2(a)(1)

119.     Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

120.     As alleged above, Defendants presented or caused to be presented to the IHCP claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were submitted using the credentials of physicians other than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

121.     These claims were submitted with the full knowledge and acquiescence of Defendant Steve Priest.

122.    These claims were false and fraudulent, in that they were (a) legally false, in that Defendants certified when making the claims that they complied with all relevant laws and regulations, when they did not, and/or (b) factually false, in that they misrepresented material facts about the services for which reimbursements were claimed.

123.    The submission of these false claims by Defendants caused the IHCP to pay out monies that it would not have paid if it had known of the falsity of the claims.

124.    Accordingly, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment in violation of the Indiana Medicaid False Claims and Whistleblower Protection Act (the "Indiana Act"). *See* Ind. Code Ann. § 5-11-5.7-2(a)(1).

125.    Each false or fraudulent claim submitted is a separate violation of the Indiana Act.

126.    By reason of the false or fraudulent claims that Defendant presented or caused to be presented, the State of Indiana suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Indiana Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the State of Indiana and Relator.

**X.**
**COUNT FOUR**
**INDIANA MEDICAID FALSE CLAIMS**
**AND WHISTLEBLOWER PROTECTION ACT:**
**MAKING OR USING FALSE RECORD OR STATEMENT**
**Ind. Code Ann. § 5-11-5.7-2(a)(2)**

127.    Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

128.    As alleged above, Defendants made and used false records and statements when they submitted or caused to be submitted to the IHCP claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were

30

submitted using the credentials of physicians other than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

129.    These false records and statements were made and used with the full knowledge and acquiescence of Defendant Steve Priest.

130.    The making and use of these false records or statements caused the IHCP to pay out monies that it would not have paid if it had known of the falsity of Defendants' records and statements.

131.    Accordingly, Defendants knowingly made and used false records or statements material to false or fraudulent claims for payment, in violation of Ind. Code Ann. § 5-11-5.7-2(a)(2).

132.    Each such making or use of a false record or statement is a separate violation of the Indiana Act.

133.    By reason of the false or fraudulent claims that Defendants made or used, or caused to be made or used, the State of Indiana suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Indiana Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the State of Indiana and Relator.

**XI.**
**COUNT FIVE**
**TENNESSEE MEDICAID FALSE CLAIMS ACT:**
**PRESENTATION OF FALSE CLAIMS**
**Tenn. Code Ann. § 71-5-182(a)(1)(A)**

134.    Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

135.    As alleged above, Defendants presented or caused to be presented to TennCare claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were submitted using the credentials of physicians other

than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

136.    These claims were false and fraudulent, in that they were (a) legally false, in that Defendants certified when making the claims that they complied with all relevant laws and regulations, when they did not, and/or (b) factually false, in that they misrepresented material facts about the services for which reimbursements were claimed.

137.    These claims were submitted with the full knowledge and acquiescence of Defendant Steve Priest.

138.    The submission of these false claims by Defendants caused TennCare to pay out monies that it would not have paid if it had known of the falsity of the claims.

139.    Accordingly, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment in violation of the Tennessee Medicaid False Claims Act (the "Tennessee Act"). *See* Tenn. Code Ann. § 71-5-182(a)(1)(A).

140.    Each false or fraudulent claim submitted is a separate violation of the Tennessee Act.

141.    By reason of the false or fraudulent claims that Defendant presented or caused to be presented, the State of Tennessee suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Tennessee Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the State of Tennessee and Relator.

## XII.
## COUNT SIX
## TENNESSEE MEDICAID FALSE CLAIMS ACT:
## MAKING OR USING FALSE RECORD OR STATEMENT
## Tenn. Code Ann. § 71-5-182(a)(1)(B)

142.    Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

32

143.     As alleged above, Defendants made and used false records and statements when they submitted or caused to be submitted to TennCare claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were submitted using the credentials of physicians other than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

144.     These false records and statements were made and used with the full knowledge and acquiescence of Defendant Steve Priest.

145.     The making and use of these false records or statements caused TennCare to pay out monies that it would not have paid if it had known of the falsity of Defendants' records and statements.

146.     Accordingly, Defendants knowingly made and used false records or statements material to false or fraudulent claims for payment, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

147.     Each such making or use of a false record or statement is a separate violation of the Tennessee Act.

148.     By reason of the false or fraudulent claims that Defendants made or used, or caused to be made or used, the State of Tennessee suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Tennessee Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the State of Tennessee and Relator.

### XIII.
### COUNT SEVEN
### VIRGINIA FRAUD AGAINST TAXPAYERS ACT:
### PRESENTATION OF FALSE CLAIMS
### Va. Code Ann. § 8.01-216.3(A)(1)

149.     Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

150.     As alleged above, Defendants presented or caused to be presented to Virginia Medicaid claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were submitted using the credentials of physicians other than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

151.     These claims were submitted with the full knowledge and acquiescence of Defendant Steve Priest.

152.     These claims were false and fraudulent, in that they were (a) legally false, in that Defendants certified when making the claims that they complied with all relevant laws and regulations, when they did not, and/or (b) factually false, in that they misrepresented material facts about the services for which reimbursements were claimed.

153.     The submission of these false claims by Defendants caused Virginia Medicaid to pay out monies that it would not have paid if it had known of the falsity of the claims.

154.     Accordingly, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment in violation of the Virginia Fraud Against Taxpayers Act (the "Virginia Act"). *See* Va. Code Ann. § 8.01-216.3(A)(1).

155.     Each false or fraudulent claim submitted is a separate violation of the Virginia Act.

156.     By reason of the false or fraudulent claims that Defendant presented or caused to be presented, the State of Virginia suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Virginia Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the State of Virginia and Relator.

## XIV.
## COUNT EIGHT
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT:
## MAKING OR USING FALSE RECORD OR STATEMENT
## Va. Code Ann. § 8.01-216.3(A)(2)

157.    Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

158.    As alleged above, Defendants made and used false records and statements when they submitted or caused to be submitted to Virginia Medicaid claims for reimbursement for (a) Suboxone prescriptions that were not medically necessary; (b) Suboxone and other prescriptions that were submitted using the credentials of physicians other than the treating physicians; (c) urine drug tests that were not medically necessary; and (d) a higher level of care than was provided.

159.    These false records and statements were made and used with the full knowledge and acquiescence of Defendant Steve Priest.

160.    The making and use of these false records or statements caused Virginia Medicaid to pay out monies that it would not have paid if it had known of the falsity of Defendants' records and statements.

161.    Accordingly, Defendants knowingly made and used false records or statements material to false or fraudulent claims for payment, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

162.    Each such making or use of a false record or statement is a separate violation of the Virginia Act.

163.    By reason of the false or fraudulent claims that Defendants made or used, or caused to be made or used, the State of Virginia suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the Virginia Act, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the State of Virginia and Relator.

35

## XV.
## PRAYER FOR RELIEF

**WHEREFORE**, Relator respectfully requests that this Court enter judgment in her favor and that of the United States and each of the Plaintiff States, and against Defendants, granting the following relief:

(A)    an award to the United States for treble its damages, a civil penalty for each violation of the FCA, and its costs pursuant to 31 U.S.C. § 3729(a)(3);

(B)    an award to Relator in the maximum amount permitted under 31 U.S.C. § 3730(d), and for the reasonable attorney's fees and costs incurred in prosecuting this action;

(C)    an award to the State of Indiana for treble its damages, a civil penalty for each violation of the FCA, and its costs pursuant to Ind. Code Ann. § 5-11-5.7-2(a)(8);

(D)    an award to Relator in the maximum amount permitted under Ind. Code Ann. § 5-11-5.7-6, and for the reasonable attorney's fees and costs incurred in prosecuting this action;

(E)    an award to the State of Tennessee for treble its damages, a civil penalty for each violation of the FCA, and its costs pursuant to Tenn. Code Ann. § 71-5-182(a)(1)(D);

(F)    an award to Relator in the maximum amount permitted under Tenn. Code Ann. § 71-5-183(d), and for the reasonable attorney's fees and costs incurred in prosecuting this action;

(G)    an award to the State of Virginia for treble its damages, a civil penalty for each violation of the FCA, and its costs pursuant to Va. Code Ann. § 8.01-216.3(A)(7);

(H)    an award to Relator in the maximum amount permitted under Va. Code Ann. § 8.01-216.7, and for the reasonable attorney's fees and costs incurred in prosecuting this action;

(I)    awards to the United States, each of the Plaintiff States, and Relator of pre- and post-judgment interest at the rates permitted by law; and

(J)    an award of such other and further relief as this Court may deem to be just and proper.

[this space intentionally left blank]

36

## XVI.
## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by the Complaint.

Dated: March 16, 2020          Respectfully submitted,

**BROWN, LLC**                    **WEATHERLY, MCNALLY & DIXON, PLC**
**Lead Counsel**                 **Local Counsel**

*/s/ Patrick S. Almonrode*             */s/ Jacqueline B. Dixon*
Patrick Almonrode                Jacqueline B. Dixon
    (*pro hac vice* application forthcoming)     Tennessee BRP No. 012054
Benjamin Lin                    Fifth Third Financial Center
    (*pro hac vice* application forthcoming)     424 Church St. Suite 2260
Jason T. Brown                 Nashville, TN 37219
    (*pro hac vice* application forthcoming)     (615) 986-3377 (office)
111 Town Square Place, Suite 400       (615) 635-0018 (fax)
Jersey City, NJ 07310              *jdixon@wmdlawgroup.com*
(877) 561-0000 (office)
(855) 582-5297 (fax)
*patalmonrode@jtblawgroup.com*
*ben.lin@jtblawgroup.com*            *Attorneys for Relator*
*jtb@jtblawgroup.com*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March _____, 2020, I caused a true copy of the Complaint in the matter captioned *United States of America, the States of Indiana and Tennessee, and the Commonwealth of Virginia ex rel. McAllister v. Spero Health, Inc., et al.* to be served upon the following, along with written disclosure of substantially all material evidence and information possessed by Relator:

*by hand delivery to*

Don Cochran
United States Attorney
Middle District of Tennessee
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203

Herbert H. Slatery III
Attorney General and Reporter
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207

*by USPS Registered Mail, Return Receipt Requested, to*

Office of the Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Curtis Hill, Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204

Mark Herring, Attorney General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode